IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VBR TOURS, LLC )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NATIONAL RAILROAD PASSENGER CORP., )<br>and YANKEE LEISURE GROUP, INC. )<br>)<br>Defendants. ) | Case No.: 14 cv 00804<br><br>Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Plaintiff VBR Tours, LLC filed its complaint against Defendants National Railroad Passenger Corp. ("Amtrak") and Yankee Leisure Group, Inc., alleging violations of the Sherman Act and Illinois Antitrust Act in the form of monopolization (Counts I and IV), conspiracy to attempt to monopolize (Counts II and V), and concerted action to restrain trade and price discrimination (Counts III and VI). Amtrak [13] and Yankee [17] move for dismissal under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court grants Defendants' motions to dismiss [13, 17].

**I.    Background**[1]

The complaint alleges that Amtrak is a monopoly created by federal statute and America's only long-distance leisure passenger rail service. VBR and Yankee are tour operators that sell Amtrak leisure travel packages to vacation destinations nationwide. The alleged

---

[1] For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

1

relevant geographic market is the United States, and the alleged relevant product market is the market for Amtrak leisure travel packages sold by tour operators to consumers.

According to the complaint, tour operators sell Amtrak leisure railway travel packages, which frequently include Amtrak rail tickets, hotels, meals, local transportation, tour guides, and admission to tourist attractions. Consumers have three means of booking a railway vacation package. They can purchase a package from a tour operator, purchase a package from a travel agent, or directly purchase all the elements of a trip separately. Tour operators sell packages to customers directly and through intermediary tour agents. Tour operators allegedly profit by marking up the total cost of the non-Amtrak ticket elements of a package and by receiving a commission from Amtrak on the rail portion of a package. Travel agents, meanwhile, profit by receiving a commission from tour operators.

Since 2006, Amtrak allegedly has appointed Yankee to be Amtrak's national tour operator. As Amtrak's preferred tour operator, Yankee allegedly receives marketing dollars and marketing support from Amtrak, direct access to Amtrak customers via advertising on the Amtrak.com website, and commissions on Amtrak rail tickets that might double the commission allotted to other travel agents and tour operators. More specifically, VBR alleges that this commission has been at least 19% as of early 2010.

Towards the end of 2007, Amtrak allegedly partnered with a travel agent consortium, Vacation.com, to launch an online booking tool called Rail Agent. Travel agents and tour operators that were members of Vacation.com could book directly with Amtrak through Rail Agent. By booking through Rail Agent, travel agents or tour operators could earn an 8% commission on commissionable trains from Amtrak or a 10% commission if the booking were for a party of 20 or more. They could receive up to 3% additional commission—a "commission

override"—depending on the growth of their quarterly revenues from the sale of Amtrak tickets. VBR used these commissions to innovate by expanding its tour offerings, growing significantly since its founding in 2004.

In 2010, Yankee offered to pay VBR a 10% commission on Amtrak tickets if VBR agreed to purchase those tickets through Yankee instead of Amtrak's rail agent. VBR declined the offer because it could earn a higher total commission through Amtrak's rail agent given the commission overrides. In recognition of VBR's rapid growth, Amtrak authorized an increase in VBR's commission to 15% that same year. However, in 2012, Amtrak informed VBR that its commission would return to 8% so Amtrak could both cut costs and "give preferential treatment" to Yankee. Compl. at ¶¶ 63, 65.

In February 2013, Amtrak submitted a request for proposals for its national tour operator contract. VBR submitted a proposal under which Amtrak would provide an 8% commission to all travel agents or tour operators, including VBR as national tour operator. Amtrak rejected VBR's proposal, instead choosing Yankee, which it continued to give at least a 19% commission. Most importantly, in 2013, Amtrak announced that it would stop paying all other travel agents and tour operators direct commissions once its current contracts terminated. Amtrak subsequently announced at a webinar for travel agents, however, that travel agents could continue to receive a commission if they booked through Yankee. Yankee announced that travel agents who were members of Vacation.com would receive a 10% commission on the Amtrak ticket portion of an Amtrak Vacations package and 12% on the non-rail portion of the package. Travel agents without a Vacation.com membership could receive an 8% commission on the Amtrak ticket portion of a package by booking with Yankee. Yankee allegedly told VBR that

"Yankee will enjoy a complete monopoly as all other travel agents and tour operators will be driven out of the Amtrak leisure travel package business." *Id.* at ¶ 100.

Counts I and IV allege that Yankee and Amtrak have violated the Sherman Act (15 U.S.C. § 2) and the Illinois Antitrust Act (740 ILCS 10/3(3)) through monopolization and a refusal to deal. The complaint specifically alleges that access to railway leisure tickets with payment of a commission is an essential facility for VBR as a tour operator. It alleges that by exclusively paying Yankee a direct commission, Amtrak has refused to deal with VBR. Counts II and V allege that in agreeing to the preferential 19% commission, Amtrak and Yankee entered into a conspiracy to attempt to monopolize in violation of the Sherman Act (15 U.S.C. § 2) and the Illinois Antitrust Act (740 ILCS 10/3(3)). Counts III and VI allege concerted action to restrain trade and price discrimination in violation of the Sherman Act (15 U.S.C. § 1) and the Illinois Antitrust Act (740 ILCS 10/3(3). Specifically, the complaint alleges that Amtrak is price discriminating by giving a Yankee at least a 19% commission while giving Yankee's competitors no direct commission.

The complaint alleges that these violations have caused various types of injuries. First,

> [p]aying a 19% or better commission to Yankee while paying VBR, other tour operators and travel agents no direct commission will result in all of those entities other than Yankee departing the market of selling railway leisure tickets. While in the short term consumers might benefit from lower prices for railway leisure packages from Yankee (which will be able to undercut the competition on price to achieve a monopoly in the market), the long-term effect is to remove competition, resulting in higher prices and worse service for consumers.

Compl. at ¶¶ 107, 131.[2] They allege that the result will be to chill price competition, reduce innovation, and restrain competition. See *id.* at ¶¶ 115, 116, 123-125, 130, 132, 139, 140, 147-

---

[2] Elsewhere, the complaint similarly alleges that
> [b]y allowing Yankee to receive higher commissions on the sale of Amtrak tickets, Yankee is able to price independent tours and escorted tours more cheaply than other tour operators, thereby preventing all others from acting as effective competitors in that market by (a) discouraging

49. The complaint states, moreover, that the "barriers [to becoming a tour operator] have become insurmountable" because Yankee can use its exclusive 19% commission to "offer significant commissions to travel agents, or discounts to end consumers, that are not available to other tour operators." *Id.* at ¶ 14.

    Second, the complaint alleges that

> [b]ecause Amtrak does not allow any mark-up of its rail tickets, Amtrak and Yankee understood that although some small percentage of passengers would—willingly or unwittingly—pay (a) a service fee or mark-up on the other elements of travel which they would request from a travel agent, or (b) a higher price for an independent tour or an escorted tour than they would have to pay Yankee, many passengers would not. For those passengers who would—willingly or unwittingly—pay a service fee, mark-up or higher price, the defendants, by the conduct alleged above, have effectively shifted the cost of the travel agent's or tour operator's fee from Amtrak to the consumer and thereby indirectly raised consumer's prices.

Compl. at ¶ 114, 120, 138, 144.

    Third, VBR alleges injury to its business and property. "Specifically, VBR will be forced to continue to purchase railway tickets with no commission or commissions substantially lower than those paid to its chief competitor. This in turn, will greatly affect VBR's ability to stay in business, let alone innovate through better technology and marketing." *Id.* at ¶¶ 110, 125, 134, 141, 150.

## II. Legal Standard On Motion To Dismiss

    The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all

---

    passengers from purchasing leisure railway travel packages from tour operators other than Yankee, including VBR, and (b) discouraging travel agents from purchasing for their clients' leisure railway travel packages from tour operators other than Yankee, including VBR.

Compl. at ¶¶ 113, 119, 137, 143.

reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

**III. Analysis**

Defendants move for dismissal under Rule 12(b)(6) on several grounds. First, Defendants argue that VBR fails to allege antitrust injury, a cognizable relevant market, and Yankee's market power, causing all counts to fail. Second, they argue that VBR's monopolization claims are implausible because the essential facilities doctrine is no longer good law and because Defendants have not denied tour operators access to the alleged essential

6

facility. Third, they argue that the attempted monopolization claims should be dismissed because the allegations regarding predatory or anticompetitive conduct committed with specific intent are factually implausible. Fourth, they argue that the price discrimination claim fails as a matter of law because the agreement requires Yankee to pay all travel agents the same 10% commission. The Court dismisses all counts, finding that the failure to allege antitrust injury alone creates sufficient grounds for dismissal.

To state an antitrust claim under the Sherman Act, a private plaintiff must allege antitrust injury—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quotation marks omitted). More specifically, a plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

A plaintiff may claim that a defendant causes such injury in the long-term by reducing prices in the short-term. However, not any allegations of reduced pricing will suffice; "only predatory pricing has the requisite anticompetitive effect." *Atl. Richfield Co.*, 495 U.S. at 339. Predatory pricing is defined as pricing "below an appropriate measure of [the defendant's] rival's costs." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atl. Richfield Co.*, 495 U.S. at 340. In contrast to "price cutting aimed simply at increasing market share," predatory pricing "harms both competitors *and* competition" in that it "has as its aim the elimination of competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479

U.S. 104, 117-18 (1986). To prevail on a claim of predatory pricing, a plaintiff must ultimately show not only below-cost pricing but also

> that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices. For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers. That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It (sic) is axiomatic that the antitrust laws were passed for the protection of *competition,* not *competitors.*

*Brooke Grp. Ltd.*, 509 U.S. at 224 (quotation marks and internal citations omitted); see *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (finding that a complaint failed to state a Sherman Act claim because it did not allege either of the two *Brooke Group* requirements that "(1) the prices complained of are below an appropriate measure of its rival's costs; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices") (quotation marks omitted). Thus, "competitors' theories of injury under section 4 deserve particularly intense scrutiny" because "the plaintiff gains from higher prices and loses from lower prices—just the opposite of the consumers' interest. When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419 (7th Cir. 1989) (citation and quotation marks omitted).

VBR's first theory of antitrust injury fails to state a claim because it alleges reduced pricing without alleging predatory pricing in particular. The complaint specifically alleges that Yankee will use its 19% commission to undercut the competition on price for railway leisure

8

packages, causing competitors to exit the market and permitting Yankee to increase prices in the long-term. Nothing in the complaint, however, states that Yankee will price its tickets specifically below cost or that Yankee has a reasonable prospect or dangerous probability of recouping this investment in below-cost prices. *Brooke Grp. Ltd*, 509 U.S. at 224; *Pac. Bell Tel. Co.*, 555 U.S. at 451. Not only does the complaint even lack boilerplate language alleging predatory pricing, but it also fails to allege facts from which the Court could infer that the alleged pricing will specifically be predatory. In fact, the complaint provides no pricing information at all. Similarly, the complaint states that Yankee's ability to underprice its competitors has created an "insurmountable" barrier to entry, chilling competition, yet VBR provides no example of a potential competitor who tried and failed to enter the marketplace, nor does it cite to on example of an existing competitor exiting the market. In the absence of any such information, the Court is left with general statements that Yankee will cause antitrust injury by reducing prices. General allegations of low prices are insufficient to state a claim because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atl. Richfield Co.*, 495 U.S. at 340.

In its second theory of antitrust injury, VBR alleges that Yankee's competitors will make up for lost commissions by marking up other elements of a travel package or creating a new service fee; it alleges that some passengers will "willingly or unwittingly" pay this higher price, in which case Defendants will have caused an indirect increase in consumer prices. This theory of antitrust injury contradicts a foundational economic assumption of antitrust law—namely, that when the market is in equilibrium, rational and informed consumers do not purchase goods at a

price that exceeds the competitive price. In the absence of allegations or arguments suggesting a reason to disregards this assumption, the Court finds this theory of antitrust injury implausible.

VBR's third theory of antitrust injury—that VBR will have access to "no commission or commissions substantially lower than those paid to its chief competitor," negatively affecting "VBR's ability to stay in business, let alone innovate through better technology and marketing"—fails because it alleges harm to one competitor rather than harm to competition. Compl. at ¶¶ 110, 125, 134, 141, 150; *Brooke Grp. Ltd.*, 509 U.S. at 224.

Lastly, VBR argues in its response that consumers will be left with little to no innovation since the "commissions VBR received from Amtrak * * * enabled it to commit resources to developing better independent tour packages as well as taking on the substantial risk of prearranging escorted tours." Resp. at 7 (quoting Compl. at ¶ 37); see Compl. at ¶ 125. But a lack of innovation is not a cognizable antitrust injury. To claim an antitrust injury, a plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus., Inc.*, 965 F.2d at 471.[3]

**IV. Conclusion**

For the foregoing reasons, the Court grants Defendants' motion to dismiss all counts [13, 17], granting VBR until 2/12/2015 to file an amended complaint if it believes it can overcome the deficiencies identified above. Should VBR wish to amend, it would be helpful if VBR could clarify whether it and other tour operators may purchase Amtrak tickets from Yankee and receive a 10% commission. The complaint alleges that tour *agents* may purchase Amtrak tickets from

---

[3] Because Illinois law directs courts to "use the construction of the federal law by the federal courts as a guide in construing" the Illinois Antitrust Act "when the wording [of the Act] is identical or similar to that of federal antitrust law" (740 ILCS 10/11), courts have held that Illinois Antitrust Act claims "will stand or fall" with federal Sherman Act claims based on the same underlying facts and legal theories. *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013). Accordingly, the Court's conclusion that the Sherman Act claims are subject to dismissal portends the same result for Plaintiff's state law claims under the Illinois Act.

Yankee and receive a 10% commission, and it states that Yankee previously offered a similar commission to VBR, but it leaves ambiguous whether VBR may currently obtain 10% commissions on Amtrak tickets purchased from Yankee, as argued by Defendants and as suggested by section four of the 2013 contract in Exhibit A. Assuming that VBR may collect a 10% commission on Amtrak tickets purchased through Yankee, an amended complaint would likely fail to state a claim. The new system of commissions would mostly change the method by which Amtrak pays commissions, not the value of those commissions, and VBR's arguments generally rely on Yankee's ability to collect a 19% commission while its competitors collect no commission. Assuming VBR wishes to file an amended complaint, VBR should also take note that Count III's claim for price discrimination is cognizable not under the Sherman Act but under the Robinson-Patman Act. *R.J. Reynolds Tobacco Co.*, 462 F.3d at 695.

Dated: January 15, 2015

_____
Robert M. Dow, Jr.
United States District Judge