**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VBR TOURS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 14-cv-00804 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| NATIONAL RAILROAD PASSENGER CORP. | ) | |
| and YANKEE LEISURE GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's motion to reconsider the Court's Opinion and Order [46] granting Defendants' motions to dismiss. For the reasons set forth below, the Court denies Plaintiff's motion. Plaintiff is given until 10/26/2015 to file a motion for leave to file an amended complaint if it believes it can overcome the deficiencies identified below consistent with Fed. R. Civ. P. 11.

## I.    Background[1]

Although the Court summarized the facts in its previous Opinion and Order, Plaintiff has clarified the nature of its factual allegations and legal arguments, warranting a new discussion. Plaintiff alleges that Amtrak is a monopoly created by federal statute and America's only long-distance leisure passenger rail service. Compl. [1] ¶¶ 1, 10. VBR and Yankee are tour operators who sell Amtrak vacation travel packages. *Id.* ¶¶ 2, 4. The relevant geographic market is the United States, and the relevant product market is "the market for Amtrak leisure travel packages

---

[1] The Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

sold by tour operators to consumers, either utilizing an intermediary travel agent or selling directly to the consumer-vacationer themselves." *Id.* ¶¶ 8, 9.

Plaintiff alleges that tour operators purchase tickets from Amtrak and combine them with other components, such as hotels, meals, local transportation, tour guides, and admission to tourist attractions, to create a travel package. *Id.* ¶¶ 2, 4, 16–20. They sell these travel packages to consumers through two distributional channels. *Id.* ¶ 8. In the first distributional channel, Amtrak sells tickets to tour operators; tour operators then sell travel packages to travel agents; and travel agents resell the travel packages to consumers. *Id.* In the second distributional channel, Amtrak sells tickets to tour operators, who then sell their travel packages directly to consumers.[2] *Id.* Tour operators profit from (1) commissions on tickets, provided by Amtrak, and (2) a mark-up on the total cost of a package. *Id.* ¶ 22. Travel agents, meanwhile, profit by receiving a commission from tour operators. *Id.*

Amtrak owns its own brand of travel packages called Amtrak Vacations®. *Id.* ¶ 27. Since 2006, Amtrak has contracted with Yankee, its national tour operator, to run operations under its brand, compensating Yankee through a 19% commission on tickets. *Id.* ¶¶ 27, 28, 14. Meanwhile, other tour operators have operated their own brands, historically receiving a lower commission. Plaintiff alleges that toward the end of 2007, Amtrak partnered with a travel agent consortium, Vacation.com, to launch an online booking tool called Rail Agent. *Id.* ¶ 25. Travel agents and tour operators who were members of Vacation.com could book tickets directly with Amtrak through Rail Agent. *Id.* By booking through Rail Agent, they could earn an 8% commission on commissionable trains from Amtrak or a 10% commission if the booking were

---

[2] Plaintiff argues in its motion for reconsideration that the Court misunderstood the nature of the relevant market because it ignored the alleged existence of the two distributional channels. That is incorrect. However, in the interest of clarity and completeness, the Court again outlines the two channels in this Opinion and Order.

for a party of 20 or more. *Id.* They could receive up to 3% additional commission—a "commission override"—depending on the growth of their quarterly revenues from the sale of Amtrak tickets. *Id.* Plaintiff used these commissions to expand its tour offerings, grow its business, and increase Amtrak's sales, becoming one of Amtrak's "best promoters" based on "exceptional customer service and its own marketing investments and talent." *Id.* ¶¶ 40–42; *see also id.* ¶¶ 34, 36, 38.

In February 2013, Amtrak submitted a request for proposals for its national tour operator contract. *Id.* ¶ 78. Plaintiff alleges that it submitted a proposal including two key terms. *Id.* ¶ 79. "The first key term in VBR's proposal was a commission rate of 8%, not the 19% or better rate Amtrak had been paying Yankee." *Id.* ¶ 80. This lower commission allegedly could have saved Amtrak approximately $3 million in commissions over three years. *Id.* "The second key term in VBR's proposal was that the commission rate of 8% was to be paid to any travel agent or tour operator, under VBR's aegis or not, whenever they favored Amtrak with a rail ticket purchase." *Id.* ¶ 81.

Amtrak rejected VBR's proposal, opting for Yankee's instead. *Id.* ¶ 83. In its contract with Amtrak, Yankee agreed to provide extensive services, including, but not limited to, the following:

> 1.1 *Amtrak Vacations.* Tour Operator shall design, develop, implement, operate and administer all aspects of a nationwide tour-package program featuring Amtrak train services, known as Amtrak Vacations. * * *

> 1.4 *Amtrak Vacations Terms and Conditions.* Tour Operator shall develop program terms and conditions for Amtrak Vacations, which shall be subject to Amtrak's prior written approval. Such terms and conditions shall include booking policy, deposit, and payment schedule, price, refunds changes and cancellation policy, and respective responsibilities of Tour Operator and Amtrak. Tour Operator must fully and adequately communicate such program terms and conditions to consumers and travel agents.

1.5     *Amtrak Vacations Tour Package Pricing.*   Subject to Amtrak's prior written approval, Tour Operator shall determine the pricing of the tour packages.

1.6     *Call Center Operations.*   Tour Operator shall operate and maintain a phone system to handle all phone calls (including customer and travel agent phone calls) * * * Tour Operator shall: (a) operate a full-service call center offering information and reservations; (b) staff the call center with well-trained and supervised agents; (c) offer referrals to regional tour operators, (d) answer eighty percent (80%) or better of the calls offered in twenty (20) seconds or less and the remaining calls within forty (40) seconds or less; and (e) provide call answering capabilities a minimum of Monday through Friday (excluding national holidays) between the hours of 7:30 a.m. CT and 7:00 p.m. CT and Saturday and Sunday between the hours of 9:00 a.m. CT and 3:00 p.m. CT * * *; and provide means for handling customer problems and emergencies on a twenty-four  (24) hour, seven (7) day per week basis.

1.7     *Reservation System.*  Tour Operator will operate and maintain a state-of-the-art web and mobile reservation system for consumer direct and travel agent bookings to automate (a) booking train space and tour components; and (b) issuing itinerary, rail tickets and tour documents.  The reservation system will also have the capability to produce (a) accounting and reporting of payments, deposits and refunds; and (b) sales and marketing reports and ad hoc reports.

1.8     *AmtrakVacations.com.*  Tour Operator will design, develop and maintain an Amtrak Vacations website, with the domain name AmtrakVacations.com. * * * Tour Operator will offer online booking capabilities to consumers and travel agents. * * *

1.9     *Mobile Site.*   Tour Operator will design, develop and maintain an Amtrak Vacations mobile site.  Amtrak shall have prior approval of all aspects of the mobile site.

1.10    *Customer Service.*   Tour Operator shall handle all customer and travel agent inquiries and complaints in a prompt, courteous and diligent manner.  All customer service issues prior to travel and while en route are to be handled immediately by telephone and resolved to the extent possible.  * * *

1.13    *Amtrak Vacations Customer/Travel Agent Database.*  Tour Operator shall develop and maintain an automated Amtrak Vacations customer/travel agent database[.] * * * Tour Operator shall develop and launch Amtrak Vacations eSpecials to Amtrak Vacations customers and travel agents on a weekly schedule (or an agreed upon schedule) throughout the year.

1.14    *Trip Protection Insurance.*  Tour Operator shall develop, maintain, promote, and implement a trip protection option for Amtrak Vacations customers.

1.15    *Operations.*    Tour Operator will continue to design, provide and staff its operation to meet the requirements of this Agreement and provide a dedicated staff and multi-functional support personnel in functional and developmental areas. * * *

1.16    *Quality Control.*    Amtrak and Tour Operator will conduct quarterly reviews to discuss Amtrak Vacations, sales and payments, technology issues, customer service, booking and ticketing, marketing staffing, budget and ongoing initiatives * * *

2.1    *Booking and Ticketing.*    Tour Operator shall book reservations and issue itineraries, tickets and vouchers for Amtrak Vacations to customers and travel agents. * * *

Tour Operator will develop, enter into contractual agreements, promote and sell the Amtrak Vacations product to travel agents, travel consortiums, and travel industry partners. * * *

5.1    *Marketing Plan.* * * * Tour Operator shall advertise, market and promote Amtrak Vacations to consumers and travel agents. * * *

5.4    *Partnerships.*    Tour Operator shall establish preferred partnerships with travel agent consortiums and industry partners (such as AAA, Vacation.com, and Avoya) to enhance the sale of the Amtrak Vacations brand. * * *

17.1    *Reports.*    Tour Operator shall provide to Amtrak the reports specified below [on revenue, data, call volume, destinations, top performing packages, travel agency/consortia/travel industry partners, finances.] * * *

21.1    Tour Operator shall procure and maintain, at its own cost and expense, continuously during the term of this Agreement * * * the types of insurance specified below [including Workers' Compensation, Commercial General Liability Insurance, Errors and Omissions/Professional Liability Insurance, Automobile Liability Insurance, Claims-Made Insurance, Crime Insurance.]

Compl. Ex. A [1-1] at 4–26.  As compensation for Yankee's services, Amtrak agreed to provide a commission on the Amtrak rail and Amtrak accommodation portion of a reservation.  *Id.* at 11.  The term of the contract was five years.  *Id.* at 12.  The contract included an option for Amtrak to extend twice for one year each time.  *Id.*

Plaintiff alleges that Amtrak chose unwisely.  There was "no sensible reason to pay Yankee $3 million more for poorer performance in contradistinction to the better service that

VBR had proven itself capable of, subjectively, and that would cost Amtrak and the American taxpayer $3 million less, objectively." *Id.* ¶ 84. In support of its allegation of Yankee's "lackluster customer service," Plaintiff states that "[o]n numerous occasions, when VBR had to contact Yankee to purchase, for example, Glacier National Park lodging that Yankee had locked up for some specific period, VBR would experience telephone hold times exceeding ten minutes, far longer than the 20- to 40-second hold times required of Yankee under the national tour operator contract." *Id.* ¶ 47.

When Plaintiff lost the contract, it contacted Amtrak and learned that "Amtrak had not even considered the (at least) $3 million difference!" *Id.* ¶ 85. Amtrak allegedly explained that it had identified Plaintiff's proposal as nonresponsive.[3] Amtrak subsequently announced that, effective November 1, 2013, it would stop paying commissions to all travel agents and tour operators with two exceptions: (1) Yankee and (2) Vacation.com and AAA, but only until the two associations' commission contracts expired. *Id.* ¶ 94. Amtrak then announced that it would sell Amtrak Vacations® packages to travel agents, providing an 8% to 10% commission on the Amtrak ticket portion of a package and a 12% commission on the non-rail portion of a package. *Id.* ¶ 95. Yankee allegedly told VBR that "Yankee will enjoy a complete monopoly as all other

---

[3] More specifically, it allegedly provided four reasons for finding Plaintiff's proposal nonresponsive. First, Amtrak stated that the resumes of Plaintiff's key personnel were too brief. Yet, according to Plaintiff, Amtrak had never asked for more detailed resumes; moreover, it had worked closely with Plaintiff's principals for almost a decade. *Id.* Second, Amtrak stated that Plaintiff would have to train people to work with Amtrak. Plaintiff contends that this was mere pretext because it had worked successfully with Amtrak for years, received better feedback than Yankee, and hired ten new employees. *Id.* ¶ 87. Third, Amtrak stated that VBR did not provide a detailed list of the hotels it offered. According to Plaintiff, however, those hotels were listed on its website, and Yankee and Plaintiff use the same hotel consolidators. *Id.* ¶ 88. Fourth, Amtrak argued that Plaintiff had never operated a third-party brand. Plaintiff counters that, in fact, "VBR had created two railway leisure brands without any preferential treatment and was growing sales at amazing rates, thusly (sic) expanding the promotion of Amtrak by magnitudes. In addition, when Amtrak rolled out its new on-line booking system, it was VBR, not Yankee, that helped Amtrak de-bug it." *Id.* ¶ 89.

travel agents and tour operators will be driven out of the Amtrak leisure travel package business." *Id.* ¶ 100.

> The complaint alleges antitrust injury occurring through the following mechanism:

> Paying a 19% or better commission to Yankee while paying VBR, other tour operators and travel agents no direct commission will result in all of those entities other than Yankee departing the market of selling railway leisure tickets. While in the short term consumers might benefit from lower prices for railway leisure packages from Yankee (which will be able to undercut the competition on price to achieve a monopoly in the market), the long-term effect is to remove competition, resulting in higher prices and worse service for consumers.

Compl. ¶¶ 107, 131; see also *id.* ¶¶ 113, 119, 137, 143. Plaintiff also alleges that Amtrak's new commission system will cause antitrust injury by reducing Plaintiff's revenue and hampering its ability to "innovate through better technology and marketing." *Id.* ¶¶ 110, 125, 134, 141, 150.

Counts I and IV respectively allege that Yankee committed monopolization in violation the Sherman Act (15 U.S.C. §§ 1, 2[4]) and the Illinois Antitrust Act (740 ILCS 10/3(3)). Counts II and V respectively allege that Amtrak and Yankee entered a conspiracy to attempt to monopolize the travel package market in violation of the Sherman Act (15 U.S.C. § 2) and the Illinois Antitrust Act (740 ILCS 10/3(2)). Counts III and VI respectively allege that Amtrak and Yankee entered into a combination, contract or conspiracy to restrain trade in violation of the Sherman Act (15 U.S.C. § 1) and the Illinois Antitrust Act (740 ILCS 10/3(3)).

## II. Legal Standards

### A. Motion for Reconsideration

Plaintiff moves for reconsideration under Federal Rule of Civil Procedure 60(b), which creates grounds for relief from a "final judgment, order or proceeding." Fed. R. Civ. P. 60(b). Because the Court previously dismissed without prejudice, its Opinion and Order was not a

---

[4] Count II includes what is likely a typo in that it alleges "Violation of § 2 of the Sherman Act (15 U.S.C. § 1)." Compl. [1] at 29. Because it involves monopolization, the Court construes it as a § 2 claim.

"final judgment, order or proceeding," and Rule 60(b) is inapplicable.  That said, the Court does have inherent authority to reconsider its own orders entered prior to final judgment.  See *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562–63 (7th Cir. 1982) (stating that interlocutory orders may be "reconsidered and reviewed at any time prior to final judgment") (citation and internal quotation marks omitted); *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 870 (7th Cir. 2007) ("[N]onfinal orders are generally modifiable * * *." (citation omitted)) (Cudahy, J., concurring).

It is well-established that "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."  *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 707 (N.D. Ill. 2006) (quoting *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996)).  In regard to the "manifest error" prong, the Seventh Circuit has explained that a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension."  *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation and internal quotation marks omitted); see also *Wiegel v. Stork Craft Mfg., Inc.*, 2012 WL 2130910, at *2 (N.D. Ill. June 6, 2012) ("Reconsideration is not appropriate where a party seeks to raise arguments that could have been raised in the original briefing."); *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) ("A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'").  And with respect to the second prong, the Seventh Circuit has explained that a motion to reconsider may be

appropriate if there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee*, 906 F.2d at 1191 (citation and internal quotation marks omitted). Because the standards for reconsideration are exacting, our court of appeals has stressed that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Id.*

## B. Motion to Dismiss

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*,

550 U.S. at 555). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III.    Analysis

The Court previously dismissed Plaintiff's complaint, finding that it failed plausibly to allege antitrust injury. To state an antitrust claim under the Sherman Act, a private plaintiff must allege antitrust injury—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quotation marks omitted). More specifically, a plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992). The Court found that Plaintiff failed to plausibly allege antitrust injury because it alleged that Yankee would reduce prices without alleging that those prices would be predatory. The Court noted that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atl. Richfield Co.*, 495 U.S. at 340.

Plaintiff moved for reconsideration, arguing that it did not and need not allege predatory pricing because its theories of anticompetitive conduct were a refusal to deal, denial of an essential facility, and exclusive dealing, not predatory pricing. Mot. to Recon. [47] at 7, 8. Concerned that it may have misapprehended Plaintiff's contentions, the Court allowed full briefing on the motion. See [52, 57]. Given its clarified understanding of the factual allegations,

the Court now addresses whether Plaintiff's theory of anticompetitive conduct plausibly gives rise both to antitrust violations and antitrust injury.

## A.    Federal Claims

### 1.    Counts I and II

Counts I and II allege violations of § 2 of the Sherman Act, which prohibits monopolization, attempted monopolization, or combinations or conspiracies to monopolize. 15 U.S.C. § 2.  Monopolization requires (1) monopoly power and (2) anticompetitive conduct designed to maintain or enhance that power improperly.  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 373 (7th Cir. 1986).  Attempted monopolization requires a defendant to engage in predatory or anticompetitive conduct with the specific intent to monopolize and a dangerous probability of achieving monopoly power.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Conspiracy to monopolize requires the existence of a combination or conspiracy, overt acts in furtherance of the conspiracy, an effect upon a substantial amount of interstate commerce, and the existence of specific intent to monopolize. *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540–41 (7th Cir. 1986).  While § 2 creates a cause of action for monopolization, attempts to monopolize, and conspiracies to monopolize, it does not create one for conspiracies to attempt to monopolize.[5]  Accordingly, the Court construes Count II as either an attempt to monopolize or conspiracy to monopolize.

---

[5] *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 372 (N.D. Ga. 1975) aff'd, 535 F.2d 313 (5th Cir. 1976); *Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 967 (N.D. Ill. 1982); *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003); *Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC*, 2012 WL 3962566, at *5 (C.D. Cal. Aug. 14, 2012); *Xtreme Caged Combat v. Cage Fury Fighting Championships*, 2015 WL 3444274, at *8 (E.D. Pa. May 29, 2015); 3B Phillip Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 809 (3d ed. 2006) ("An occasional complaint has alleged that the defendant conspired to attempt to monopolize.  Courts have correctly held that § 2 states no such offense.  Nor is there any need for it, because the combination that offends antitrust policy violates § 1.").

Regardless of whether a plaintiff alleges monopolization, attempted monopolization, or conspiracy to monopolize, § 2 requires a plausible allegation of anticompetitive conduct. See *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). Plaintiff contends that Amtrak violated § 2 through a refusal to deal, the denial of an essential facility, and exclusive dealing. The Court addresses (and rejects) each theory in turn and further explains why Plaintiff fails to state a claim under the Supreme Court's *Pacific Bell* decision or to plausibly allege antitrust injury.

### a.      Refusal to Deal and Essential Facilities Claim

Businesses are generally "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This right to refuse to deal exists for three reasons. First, it encourages competition: "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407–08. Second, enforced sharing "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408; accord *Pac. Bell*, 555 U.S. at 452. Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408.

For these reasons, the Supreme Court has been "very cautious" in recognizing limited exceptions to the right not to deal. *Trinko*, 540 U.S. at 408. The first exception requires predatory pricing, meaning "below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses." *Pac. Bell*, 555 U.S. at 448. The second exception requires a refusal to deal in violation of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). Closely related is the essential facilities doctrine, a controversial concept articulated in *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983). See *Trinko*, 540 U.S. at 411 ("We have never recognized such a doctrine * * *."). If Plaintiff's claim is cognizable at all, it must fall within one or both of the latter two exceptions.

*Aspen Skiing* created a limited refusal-to-deal exception located "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 399. The case involved a ski area consisting of four mountain areas, three owned by the defendant and one owned by the plaintiff. As part of a joint venture, the parties issued a joint multiple-day ticket covering all four mountains. The defendant subsequently demanded a higher percentage of revenue. When the plaintiff objected, the defendant withdrew from the deal. Faced with the prospect of declining revenue, the plaintiff reattempted to negotiate a deal, even offering to buy defendant's tickets at retail price. But the defendant refused. The plaintiff consequently sued under the Sherman Act.

The Supreme Court affirmed the judgment against the defendant because the defendant's "unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. In particular, the "defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* The evidence thus

supported an inference that the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing*, 472 U.S. at 610-11. Put differently, the evidence suggested that the defendant's decision was "irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013); see also 3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 772, at 223 (3d ed. 2008) (the refusal must be "irrational" but for its anticompetitive tendencies). Since deciding *Aspen Skiing*, the Supreme Court has declined to recognize any other cases falling within this "limited exception." *Trinko*, 540 U.S. at 399.

Plaintiff's claim lacks essential features of *Aspen Skiing*. First, unlike the defendant there, Amtrak has not terminated its dealings with Plaintiff. On the contrary, it continues to offer Amtrak tickets to Plaintiff—just not at Plaintiff's desired price. Put differently, the commissions are the functional equivalent of a contingent discount offered to wholesalers. When Amtrak removed Plaintiff's commission, it removed the discount, raising the cost of Plaintiff's tickets from wholesale to retail prices. In direct contrast, the defendant in *Aspen Skiing* refused to sell Plaintiff tickets "*even if compensated at retail price*." *Trinko*, 540 U.S. at 409. Thus, while *Aspen Skiing* involved an absolute refusal to deal, this case involves a refusal to deal at Plaintiff's desired (below-retail) price.

A claim involving a refusal to deal at a certain price is ill-suited to judicial resolution. "If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions. That would not only risk judicial complicity in collusion and dampened price competition. It would also require us to become 'central planners,' a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the

past." *Novell*, 731 F.3d at 1073 (citing *Trinko*, 540 U.S. at 407–08; 3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 772, at 220 (3d ed. 2008)).  Plaintiff's request that the Court create an equal playing field by invalidating the Amtrak-Yankee contract implicates precisely these concerns.  If the Court prohibited unequal commissions, Amtrak could easily eliminate all commissions, pay Yankee through a separate mechanism, and achieve the identical effect.  In other words, implementing Plaintiff's request could degenerate into a promethean effort to supervise Amtrak's dealings with tour operators—a task normally addressed by regulators, not courts.

Second, Plaintiff's claim is distinguishable from *Aspen Skiing* because, by attaching the Yankee–Amtrak contract to the complaint, Plaintiff itself pleads valid business reasons for Amtrak to (1) select Yankee as its tour operator and (2) pay Yankee through commissions.  As to the first choice, Yankee agreed in the contract to provide Amtrak extensive services in exchange for payment.[6]  Thus, unlike the scenario in *Aspen Skiing*, where the defendant destroyed short-term value for itself, the contract here enabled Amtrak to receive value.  Plaintiff's claim that

---

[6] In exchange for the 19% commission, Yankee agreed, for example, to "design, develop, implement, operate and administer all aspects" of Amtrak Vacations®; "develop program terms and conditions for Amtrak Vacations"; "adequately communicate such program terms and conditions to consumers and travel agents"; "determine the pricing of the tour packages"; "operate and maintain a phone system to handle all phone calls (including customer and travel agent phone calls)"; "operate and maintain a state-of-the-art web and mobile reservation system"; "design, develop and maintain an Amtrak Vacations website";  "handle all customer and travel agent inquiries and complaints in a prompt, courteous and diligent manner"; "develop and maintain an automated Amtrak Vacations customer/travel agent database"; "develop, maintain, promote, and implement a trip protection option for Amtrak Vacations customers"; "design, provide and staff its operation to meet the requirements of this Agreement"; "conduct quarterly reviews to discuss Amtrak Vacations, sales and payments, technology issues, customer service, booking and ticketing, marketing staffing, budget and ongoing initiatives"; "book reservations and issue itineraries, tickets and vouchers for Amtrak Vacations to customers and travel agents"; "develop, enter into contractual agreements, promote and sell the Amtrak Vacations product to travel agents, travel consortiums, and travel industry partners"; "advertise, market and promote Amtrak Vacations to consumers and travel agents"; "establish preferred partnerships with travel agent consortiums and industry partners (such as AAA, Vacation.com, and Avoya) to enhance the sale of the Amtrak Vacations brand"; provide Amtrak with specified reports; and purchase insurance in compliance with the contract.  Compl. Ex. A [1-1] at 4–26.

Amtrak had "no sensible reason" to choose Yankee is therefore legally implausible; numerous procompetitive business reasons appear on the face of the contract. *Id.* ¶ 84. A valid reason to provide compensation specifically through commissions also appears on the face of the contract: by making payment contingent on sales, Amtrak created an incentive for Yankee to sell as many tickets as possible, generating more value for Amtrak.

Plaintiff contends that the Amtrak–Yankee contract was nevertheless anticompetitive for three reasons. First, Yankee provided worse customer service than Plaintiff. The Court is unpersuaded by this conclusory allegation; Plaintiff supports it only by contending that, when it called Yankee, it experienced hold times of more than ten minutes. *Id.* ¶ 47. It is not the judicial role to evaluate whether VBR or Yankee has better customer service. Second, Plaintiff contends that Amtrak's four reasons for finding its proposal nonresponsive were pretextual. Even if that were true, it only explain why Amtrak rejected Plaintiff's proposal, not why Amtrak lacked procompetitive reasons to choose Yankee. Third, Plaintiff argues that its offer cost $3 million less over the first three years. Because Plaintiff provides no explanation of what services it offered Amtrak, the $3 million differential fails to explain why its offer was more cost-effective than Yankee's, even if it was cheaper.

Most importantly, none of these reasons is persuasive because the question is not whether Amtrak chose the most competitive offer but whether it had *any* procompetitive purpose. It is not whether Amtrak optimally (or even prudently or competently) exercised its business judgment but whether it had any valid business reason. Antitrust law does not authorize courts (or disappointed bidders) to impose their business judgments on market players. *Aspen Skiing*'s limited exception authorizes intervention only when a defendant's decision is "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075; see also 3B Phillip E. Areeda & Herbert

16

Hovenkamp, ANTITRUST LAW ¶ 772, at 223 (3d ed. 2008) (the refusal must be "irrational" but for its anticompetitive tendencies).

In sum, by attaching the Amtrak–Yankee contract to its complaint, Plaintiff provides numerous valid business reasons for the contract that it seeks to undo. It then fails to address, let alone plausibly rebut, those reasons in the body of its complaint. "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998); see also *Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992) ("A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."). Accordingly, Plaintiff pleads itself out of court based on the information in the contract.[7]

Because Plaintiff does not allege a refusal to deal that was "irrational but for its anticompetitive effects," it fails to state a claim within the outer bounds of § 2 liability recognized in *Aspen Skiing*.

### b. Denial of an Essential Facility

Finding no plausible refusal to deal claim under *Aspen Skiing*, the Court now considers whether Plaintiff states an essential facilities claim, to whatever extent such a claim may be distinct from a refusal-to-deal claim. See *Trinko*, 540 U.S. at 410–11 (suggesting that the essential facilities doctrine falls partly if not wholly within the refusal-to-deal rubric); *Olympia*, 797 F.2d at 377 ("[*Aspen Skiing*] is like the essential-facility cases in that the plaintiff could not

---

[7] Case law does not make clear whether a procompetitive business reason is a pleading requirement or an affirmative defense that a Plaintiff need not anticipate in its complaint. See *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) ("Resolving defenses comes after the complaint stage."). Here, the difference is immaterial because Plaintiff itself supplied the procompetitive business reasons without effectively countering them.

compete with the defendant without being able to offer its customers access to the defendant's larger facilities.").

In short, the essential facilities doctrine, as articulated in *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983), says that "firms controlling an essential facility [have] the obligation to make the facility available on non-discriminatory terms." *MCI*, 708 F.2d at 1132. The purpose of the doctrine is to prevent a monopolist from using its "control of an essential facility (sometimes called a 'bottleneck') [to] extend monopoly power from one stage of production to another, and from one market into another." *Id.* at 1132.

As an initial matter, the Court notes that the viability of the essential facilities doctrine is in question. The doctrine "has been criticized as having nothing to do with the purposes of antitrust law," in part because consumers "are not better off if the natural monopolist is forced to share some of his profits with potential competitors." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995). As Professors Areeda and Hovenkamp have explained,

> a monopolist cannot earn double profits by monopolizing a second, vertically related market. If a single firm controlled the world's only bauxite mine, the firm could monopolize aluminum manufacture as well by refusing to sell bauxite to others. Access to the mine is undeniably essential to a would-be aluminum manufacturer, but we cannot infer from the bauxite monopolist's refusal to sell ore that any less aluminum would be produced or that its price would be any higher.

3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 773c, at 248 (3d ed. 2008) ("Lest there be any doubt, we state our belief that the essential facilities doctrine is both harmful and unnecessary and should be abandoned").[8] Although the Seventh Circuit has criticized its

---

[8] An exception to this general principle exists where a price-regulated monopolist projects its monopoly into another market to capture more surplus. See *Olympia Equip.*, 797 F.2d at 374; *Fishman v. Estate of Wirtz*, 807 F.2d 520, 571 (7th Cir. 1986) (Easterbrook, J., dissenting). This exception is not at issue here.

own doctrine—whether tangentially in *Schor* (as explained below) or explicitly in *Blue Cross*—it also has stated that it is unauthorized "to abrogate doctrines that have been endorsed and not yet rejected by the Supreme Court." *Blue Cross*, 65 F.3d at 1413. And although the Supreme Court observed in *Trinko* that it has "never recognized such a doctrine," it did not take the opportunity to repudiate it either. *Trinko*, 540 U.S. at 411. *Trinko* thus leaves the essential facilities doctrine hobbling on one foot.

With that in mind, the Seventh Circuit's analysis in *Schor v. Abbott Labs.*, 457 F.3d 608, 612 (7th Cir. 2006)—a factually similar case not involving the essential facilities doctrine— becomes informative here. *Schor* involved a defendant with a patent on a drug called Norvir. In additional to selling Norvir, the defendant also sold Kaletra, a combination drug that included Norvir as one component. The defendant allegedly monopolized the market for combination drugs by charging too much for Norvir alone and too little for Kaletra; it allegedly planned to induce patients to buy Kaletra, drive other combination vendors out of business, and permit the defendant to increase the price of both Kaletra and Norvir. The Seventh Circuit affirmed dismissal for failure to state a claim, reasoning that

> a firm that monopolizes some essential component of a treatment (or product or service) can extract the whole monopoly profit by charging a suitable price for the component alone. If the monopolist gets control of another component as well and tries to jack up the price of that item, the effect is the same as setting an excessive price for the monopolized component. The monopolist can take its profit just once; an effort to do more makes it worse off and is self-deterring.

*Schor*, 457 F.3d at 612.

Although *Schor* was not an essential facilities or refusal-to-deal claim, its reasoning is applicable by analogy. As in *Schor*, Plaintiff here alleges that Amtrak charges tour operators other than Yankee too much for the input (the ticket) and that Yankee will therefore charge consumers too little for the combination (Amtrak Vacations®), so that it can drive competitors

out of business and then sell Amtrak Vacations® for more.  To be sure, the facts alleged here are different in one respect: Plaintiff alleges that Amtrak created two input prices—one for Yankee and another for everyone else—and that Yankee, not Amtrak, sells Amtrak Vacations®.  But the same economic principles apply because the commissions were payment for services that only Yankee provided to Amtrak; Amtrak could have created one high price for all tour operators, putting itself in the position of the defendant in *Schor* by acquiring Yankee or creating an in-house tour operator.  Instead, it contracted with Yankee and paid it through commissions.  Its decision to accomplish via contract what it could have done by acquiring Yankee or creating an in-house tour operator does not plausibly implicate the "prime concern" of the essential facilities doctrine, which is to prevent a monopolist from using its monopoly power in one market "as a lever to impede or destroy competition in other markets."  *MCI*, 708 F.2d at 1144.  Thus, the viability of Plaintiff's claim is questionable under *Schor*.

But even assuming that the doctrine still stands, Plaintiff fails to state an essential facilities claim.  To state an essential facilities claim, a plaintiff must allege four elements: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."  *MCI*, 708 F.2d at 1132–33.  Where there is a "legitimate business or technical reason" to deny access, there is no essential facilities claim.  *MCI*, 708 F.2d at 1133.

Plaintiff's essential facilities claim is problematic for three reasons.  First, it improperly defines the essential facility as Amtrak tickets at wholesale prices, rather than Amtrak tickets alone.  Case law does not support a definition of an essential facility that includes a price term.

It generally identifies essential facilities as the facilities alone,[9] and for good reason: a definition of a facility that included price terms would require courts to assume the role of price-regulating agencies—a role for which they are ill-equipped.

Second, Plaintiff fails to plausibly allege the third element of an essential facilities claim—namely, "the denial of the use of the facility to a competitor." *MCI*, 708 F.2d at 1132–33. Relevant here is the degree of access required to state an essential facilities claim: no access or merely unequal access? *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383 (1912), the progenitor of the doctrine, required equal access to an essential facility. Since *Terminal Railrod*, however, the Supreme Court has made clear that to the extent the essential facilities doctrine is viable, "the indispensable requirement for invoking [it] is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." *Trinko*, 540 U.S. at 411. Consistent with this statement, Seventh Circuit case law has required an absolute denial or its functional equivalent. *MCI* involved AT&T's complete refusal to interconnect MCI to the local distribution facilities of Bell operating companies—a refusal that precluded MCI from offering certain services to its customers. *MCI*, 708 F.2d at 1132. Similarly, in *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986), the defendants' "discriminatory" terms were tantamount to a complete denial of access.[10] See also *United Asset*

---

[9] See, *e.g.*, *Aspen Skiing*, 472 U.S. 585 (arguably an essential facilities case in which the facility was a mountain); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (arguably an essential facilities case in which the facility was a power facility); *Associated Press v. United States*, 326 U.S. 1 (1945) (arguably an essential facilities case where the facility was membership in the Associated Press); *Terminal R. R. Ass'n of St. Louis*, 224 U.S. 383, (arguably an essential facilities case where the facility was a railroad terminal); *MCI*, 708 F.2d at 1133 (defining the essential facility as the "interconnections for FX and CCSA service"); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) (identifying the facility as a sports arena).

[10] *Fishman* involved Chicago Basketball's attempt to sell the Chicago Bulls to the plaintiffs. The sale was contingent on NBA approval, which required the plaintiffs to obtain a lease from a stadium. The stadium owner, who was a member of a competing bidder, thwarted the sale by offering terms so

*Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1049 (N.D. Ill. 2006) ("[T]he absolute refusal to deal that the essential facilities doctrine appears to contemplate is not present here.").

Plaintiff fails to allege a complete denial of access or its functional equivalent. More specifically, it fails to explain why Amtrak's commission to *Yankee* precludes *Plaintiff* from purchasing Amtrak tickets, or why access at retail prices amounts to a de facto denial of access (and perhaps it is precisely for this reason that Plaintiff attempts to define the essential facility as the tickets at wholesale prices). In effect, Plaintiff asks not for access but for access on its own terms. The essential facilities doctrine is not amenable to this demand[11] and, again, for good reason, as Plaintiff's requested relief could require ongoing supervision beyond the institutional competency of the judiciary.

Plaintiff's citation to *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) is unpersuasive, regardless of whether the Court construes it as an essential facilities case or a refusal to deal case. *Kodak* imposes a duty to deal where changing an existing course of distribution enables a firm to "take advantage of customers' sunk costs":

---

unreasonable that he effectively refused to grant them a lease. More specifically, he offered to give Chicago Basketball a ten-year lease that would be assignable only if Chicago Basketball agreed to an onerous guarantee, including rent payments, for the entire ten-year term. The Seventh Circuit found these terms tantamount to a refusal to lease because (1) they dealt with the owner of the Bulls, not the plaintiff; (2) he promised but failed to follow up on his offer, indicating intent not to lease; (3) there was good reason to believe that Chicago Basketball would reject the offer; and (4) the evidence sufficiently supported the conclusion that the owner agreed to withhold the stadium from the plaintiffs and give his own group a lease instead. See *id.* at 540–41.

[11] See *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996) (finding no essential facility violation where the defendant continued servicing the plaintiff but charged it significantly more than market price); *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 545 (4th Cir. 1991) (finding no essential facility violation where a defendant railroad offered to ship the plaintiff's sand and gravel but would not grant trackage rights allowing the plaintiff to ship them on its own); *Valet Apartment Servs., Inc. v. Atlanta Journal & Constitution*, 865 F. Supp. 828, 833 (N.D. Ga. 1994) (finding no essential facility claim where a defendant newspaper permitted plaintiff to purchase certain types of advertisements but not others).

> Kodak sold copiers that customers could service themselves (or through independent service organizations). Having achieved substantial sales, Kodak then moved to claim all of the repair work for itself. That change had the potential to raise the total cost of copier-plus-service above the competitive level—and, we observed in *Digital Equipment,* above the price that Kodak could have charged had it followed a closed-service model from the outset. Schor does not accuse Abbott of any similar switch that would exploit customers' sunk costs; none is possible in this market.

*Schor*, 457 F.3d at 614. In contrast to copiers and maintenance service, both VBR and Yankee sell Amtrak tickets within the packages, precluding any equivalent lock-in effect.

Third, as explained above, Plaintiff pleads itself out of court by alleging a "legitimate business or technical reason" (*MCI*, 708 F.2d at 1133) for Amtrak's conduct.

For these reasons, Plaintiff fails to state an essential facilities claim.

### c.    Exclusive Dealing

Plaintiff also alleges a theory of anticompetitive conduct based on exclusive dealing.[12] Plaintiff's theory is implausible for two reasons. First, there is no exclusivity. Amtrak continues to sell tickets to tour operators other than Yankee. Second, even if exclusivity existed, Plaintiff still would fail to state a claim. "Unlike horizontal agreements between competitors, vertical exclusive distributorships * * * are presumptively legal. Rather than condemning exclusive dealing, courts often approve them because of their procompetitive benefits," such as increasing allocative efficiency, reducing adverse selection and moral hazard barriers to deals, and preventing free-riding. *Republic Tobacco*, 381 F.3d at 736.[13] Accordingly, exclusive dealings

---

[12] Plaintiff did not present this argument in its complaint or in response to Defendants' motions to dismiss, instead arguing it for the first time in this motion to reconsider. In the interests of efficiently managing the litigation moving forward, however, the Court explains why this theory also is implausible based on Plaintiff's factual allegations.

[13] For example, exclusive dealing may enhance allocative efficiency: if "exclusive dealing leads dealers to promote each manufacturer's brand more vigorously than would be the case under nonexclusive dealing, the quality-adjusted price to the consumer (where quality includes the information and other services that dealers render to their customers) may be lower with exclusive dealing than without[.]" *Roland Mach*,

violate the Sherman Act "only when they foreclose competition in a substantial share of the line of commerce at issue." *Id.* (addressing exclusive dealing claims brought under § 1 and § 2); *see also Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 320–27 (1961).

The contention that the Amtrak–Yankee agreement forecloses competition is implausible for the reasons explained by the Second Circuit in *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 26–29 (2d Cir. 2006), which parallel in many respects the Seventh Circuit's analysis in *Schor*. *E & L* concerned Doman, a defendant with a monopoly on green hem-fir lumber, and E & L, one of its distributors. Doman terminated its agreement with E & L and entered an exclusive agreement with an alternative distributor. The Second Circuit affirmed the dismissal of E & L's complaint for failure to state a claim under § 1 or § 2, reasoning that "such a vertical arrangement provides no monopolistic benefit to Doman [the defendant] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined." *E & L*, 472 F.3d at 29. It added:

> [H]ad Doman established its own in-house distribution system with the same monopoly that Sherwood is alleged to possess, there would have been no increase in the restriction of output of green hem-fir lumber and in the resultant misallocation of resources.
>
> Indeed, an exclusive distributorship would be counterproductive so far as any monopolization goal of Doman is concerned. A monopolist manufacturer of a product restricts output of the product in order to maximize its profits. The power to restrict output to maximize profit is complete in the manufacturing monopoly, and there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product. On the contrary, a firm with a monopoly at the retail distribution level will further reduce output to maximize *its* profits, thereby reducing the sales and profit of the monopoly manufacturer. Like any

749 F.2d at 395. Exclusive distributorships also may address adverse selection or moral hazard concerns inhibiting productive deals: "A dealer who expresses his willingness to carry only one manufacturer's brand of a particular product indicates his commitment to pushing that brand; he doesn't have divided loyalties. If the dealer carries several brands, his stake in the success of each is reduced." *Id.* Exclusive dealing also can "prevent dealers from taking a free ride on [the seller's] efforts (for example, efforts in the form of national advertising) to promote his brand." *Id.*

seller of a product, a monopolist would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits in the way of, for example, product promotion or distribution. In fact, we have explicitly noted that a vertically structured monopoly can take only one monopoly profit.

The only detriment to competition alleged to result from the Doman–Sherwood agreement is that end-users of lumber and finished wood products have fewer options to purchase their required supplies and are now required to pay artificially inflated prices. This, by itself, is not a sufficient allegation of harm to competition caused by the exclusive distributorship, again, because the alleged single source and price increase, even if monopolistic, is something Doman can achieve without the aid of a distributor.

*Id.* at 29–30 (internal citations omitted). The same is true here. Amtrak has not increased its surplus by hiring Yankee and paying it in the form of an exclusive commission. It could have accomplished the same effect by acquiring a tour operator or creating its own in-house tour operator.

In addition, the scenario presented here and in *E & L* is distinguishable from those in the cases cited by Plaintiff. Here and in *E & L*, a monopolist allegedly deals exclusively with one downstream player. In contrast, *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), involve downstream buyers purchasing exclusively from one upstream seller, threatening to foreclose opportunities to other sellers. The second scenario threatens to expand the seller's market share, whereas the scenario here and in *E & L* provides the seller no new surplus.[14] Plaintiff may be dissatisfied that Amtrak chose to share its monopoly surplus with Yankee, not Plaintiff,[15] but an antitrust action is not an

---

[14] *LePage* is also distinguishable in that it involved bundled rebates and all-or-nothing discounts analogous to product tying. *Id.* at 154–59.

[15] Plaintiff's allegation regarding the distribution of monopoly surplus is implausible itself in that it suggests that Amtrak gave away all of its monopoly surplus in exchange for nothing. *Id.* ¶¶ 122, 146. ("Amtrak is not advancing its own interests, but instead only advancing Yankee's interests; *to wit*—the elimination of all of Yankee's competition.").

appropriate vehicle for redistributing Amtrak's monopoly surplus according to Plaintiff's preferences.

### d. *Pacific Bell*

Plaintiff also fails to state a claim under *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009). Although neither party cites it, *Pacific Bell* is instructive. *Pacific Bell* was brought by internet service providers (ISPs) that sold DSL to retail customers. The defendant, AT&T, owned infrastructure and facilities that the ISPs needed to provide DSL to their customers. AT&T operated at the wholesale and retail levels, providing ISPs with wholesale DSL transport service and selling DSL directly to retail consumers. The ISPs sued AT&T under § 2 of the Sherman Act, alleging a novel price-squeezing claim. Specifically, they contended that AT&T set a high price for wholesale DSL transport service and a low price for its own retail DSL service, placing the ISPs at a competitive disadvantage and squeezing their profit margins. The Supreme Court affirmed dismissal for failure to state a claim, finding no violation either in the wholesale or retail markets.

At the wholesale level, the Court found no antitrust duty to deal because any such duty arose only from FCC regulations. See *Pacific Bell*, 555 U.S. at 450. Under *Trinko*, "a firm with no duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors." *Id.* at 450–51. Accordingly, "AT&T was not required to offer this service at the wholesale prices the plaintiffs would have preferred," and its wholesale prices did not violate the Sherman Act. *Id.* at 451.

At the retail level, the *Pacific Bell* plaintiffs failed to state a claim because they only alleged low retail prices, not predatory prices. As this Court explained extensively in its previous Opinion and Order, antitrust law encourages rather than prohibits low prices.

"[C]utting prices in order to increase business often is the very essence of competition." *Pacific Bell*, 555 U.S. at 451 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)). Thus, "[i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Id.* (quoting *Matsushita*, 475 U.S. at 594). The Supreme Court has thus "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *Id.* Specifically, a plaintiff must demonstrate that "(1) the prices complained of are below an appropriate measure of its rival's costs; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices." *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24 (1993) (internal quotation marks omitted)).

Taking into account both retail and wholesale prices, the Supreme Court held that combined effect was a failure to state a claim:

> *Trinko* holds that a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals. *Brooke Group* holds that low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the predator will be able to recoup the profits it loses from the low prices. In this case, plaintiffs have not stated a duty-to-deal claim under *Trinko* and have not stated a predatory pricing claim under *Brooke Group*. They have nonetheless tried to join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized by this Court. We decline the invitation to recognize such claims. Two wrong claims do not make one that is right.

*Pac. Bell Tel. Co.*, 555 U.S. at 457 (internal citations omitted).

Like the plaintiff in *Pacific Bell*, Plaintiff fails to state a claim; it fails to allege a duty to deal at the wholesale level, and it fails to allege predatory pricing at the retail level. The facts are not identical insofar as Yankee and Amtrak are two separate entities, whereas in *Pacific Bell*,

AT&T alone operated at the wholesale and retail levels. However, this difference is immaterial; again, Amtrak could have accomplished the same effect by acquiring Yankee or creating an in-house tour operator.

The Court previously dismissed Plaintiff's claim because it failed to allege predatory prices. Instead of amending its complaint, Plaintiff moved to reconsider, expressly disclaiming a predatory pricing scheme and continuing to argue that Yankee's commission will enable it to drop prices and drive competitors out of business. Unless Plaintiff can allege that Yankee will adopt below-cost prices with a dangerous probability of recoupment, it can only show lower prices that benefit consumers. Plaintiff may plausibly allege reduced profits, but that is not enough to allege an antitrust violation under § 2.

### e. Antitrust Injury

For many of the same reasons, the Court continues to believe that Plaintiff fails to allege antitrust injury—in other words, "that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis*, 965 F.2d at 471. To the extent that Plaintiff suggests that reduced innovation without reduced output or increased prices creates antitrust injury, the Court is unpersuaded. First, it is well-established that either increased price or reduced output is necessary to show antitrust injury. See, *e.g.*, *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Stamatakis*, 965 F.2d at 471)). Second, Plaintiff cites case law that did not involve lone allegations of reduced innovation but also increased prices or reduced output. See *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012). Third, Plaintiff's theory that an inability to innovate constitutes antitrust injury is a variation on a theme already rejected above. Plaintiff allegedly wishes to innovate by reinvesting profits back into the company—that is, by using

profits to develop new products. It contends that it will have less money to develop its products because Yankee will reduce prices, consumers will choose Yankee's products over Plaintiff's products, and Plaintiff's profits will drop. But as long as Yankee's prices are not predatory, antitrust law is not concerned with Plaintiff's lower profit margins. Accordingly, Plaintiff fails to allege antitrust injury.

### 2. Count III

Count III alleges a violation under § 1 of the Sherman Act, which prohibits contracts or conspiracies in restraint of trade or commerce. 15 U.S.C. § 1. To adequately state a claim under § 1, a plaintiff must allege: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). "There are two standards for evaluating whether an alleged restraint of trade is unreasonable: the rule of reason and the *per se* rule." *Id.* at 1220. Regardless of which rule applies, the focus is the same. Both rules "are employed to form a judgment about the competitive significance of the restraint." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103 (1984) (citation and internal quotation marks omitted).

Viewed under § 1 or § 2, the economics of Plaintiff's factual allegations remain the same.[16] As explained above, Amtrak uses Yankee to accomplish what it could do alone, rendering the Amtrak-Yankee relationship unlikely to increase Amtrak's monopoly surplus, raise prices, or decrease output. As a result, Amtrak and Yankee's conduct does not create antitrust injury, nor is it of "competitive significance," *id.*, and Plaintiff thus fails to state a claim under both sections of the Sherman Act.

---

[16] The Court accepts for purposes of this opinion Plaintiff's assertion, see [47], at 12, that the Robinson–Patman Act is inapplicable to the allegations of Plaintiff's complaint.

### B.     State Claims

Because Illinois law directs courts to "use the construction of the federal law by the federal courts as a guide in construing" the Illinois Antitrust Act "when the wording [of the Act] is identical or similar to that of federal antitrust law" (740 ILCS 10/11), courts have held that Illinois Antitrust Act claims "will stand or fall" with federal Sherman Act claims based on the same underlying facts and legal theories. *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013). Plaintiff has provided no reason either in its response to Defendants' motions to dismiss or in its motion to reconsider for the Court to find otherwise. Accordingly, the Court's conclusion that the Sherman Act claims are subject to dismissal portends the same result for Plaintiff's state law claims under the Illinois Act.

## IV.     Conclusion

For the reasons stated above, the Court denies Plaintiff's motion to reconsider [46]. Plaintiff is given until 10/26/2015 to move for leave to file an amended complaint if it believes it can overcome the deficiencies identified below consistent with Fed. R. Civ. P. 11.


Dated: September 28, 2015

_____
Robert M. Dow, Jr.
United States District Judge